# In the United States Court of Federal Claims

No. 15-1425C
(Filed:  March 30, 2016)*
*OPINION ORIGINALLY FILED UNDER SEAL ON MARCH 25, 2016

| | |
|---|---|
| REMINGTON ARMS CO., LLC, ) | |
| ) | |
| Plaintiff, ) | Bid Protest; Responsibility |
| ) | Determination; FAR § 9.104-1; |
| v. ) | Bankruptcy; Injunctive Relief Granted |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| and ) | |
| ) | |
| COLT DEFENSE, LLC, ) | |
| ) | |
| Defendant-Intervenor ) | |
| and ) | |
| ) | |
| FN AMERICA, LLC, ) | |
| ) | |
| Defendant-Intervenor ) | |
| ) | |

*Walter Brad English*, with whom were *J. Andrew Watson, III*, *Kevin C. Gray*, *Jon D. Levin*, and *Emily J. Chancey*, Huntsville, AL, for plaintiff.

*Igor Helman*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, and *Robert E. Kirschman, Jr.,* Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Frank A. March*, US Army Legal Services Agency, and *Casey P. Nix*, US Army RDECOM-ARDEC, of counsel.

*John E. McCarthy, Jr.*, with whom was *Robert J. Sneckenberg*, for defendant-intervenor Colt Defense, LLC.

*William A. Wozniak*, with whom was *Anthony H. Anikeeff*, of counsel, Tysons, VA, for defendant-intervenor FN America, LLC.

# OPINION

**FIRESTONE**, *Senior Judge*

Pending before the court in this post-award bid protest are cross-motions for judgment on the administrative record filed under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") by plaintiff, Remington Arms Company, LLC ("Remington"); the defendant, the United States; defendant-intervenor, Colt Defense LLC ("Colt"), and defendant-intervenor FN America, LLC ("FN"). Remington challenges the government's decision to award one of two Indefinite Quantity Indefinite Award ("IDIQ") contracts for producing M4 and M4A1 carbines to defendant-intervenor Colt. The other contract was awarded to FN America, LLC. Also pending before the court is Remington's motion to supplement the administrative record.

Remington's bid protest is focused on whether the contracting officer's ("CO") decision to award a contract to Colt while Colt was still in bankruptcy and was labeled "high" risk by the Defense Contract Management Agency ("DCMA") was arbitrary, capricious, and an abuse of discretion. The DCMA based its high risk rating on fact that Colt had recently filed for Chapter 11 bankruptcy protection and the fact that Colt's liabilities far exceeded its assets. The DCMA was uncertain whether Colt would have enough working capital to fulfill the contract. Further, at the time of the award, Colt did not have a long-term lease for the facility in which it intended to manufacture the M4s. According to Remington, the CO failed to properly evaluate the DCMA report or evidence she reviewed from the bankruptcy proceeding. Remington relies on evidence from the bankruptcy proceeding to show that, at the time of award, Colt faced possible

liquidation and that Colt's manufacturing facility lease was set to expire.  Remington argues that the CO's responsibility determination under FAR § 9.104 is unsupported and was thus arbitrary and capricious.[1]  Remington further argues that the government's technical evaluation of Colt's proposal was arbitrary, capricious, or an abuse of discretion because the technical evaluation did not take into account the possibility that Colt would lose its lease.  Remington is seeking an injunction requiring the government to either set aside the award to Colt or to redo Colt's responsibility determination.  In the interim Remington asks that no additional task orders be awarded to Colt.[2]

The government and Colt argue in response that the CO's award decision and responsibility determination are both rational and supported by the record. The government and Colt also argue that even if Remington is correct with regard to the CO's responsibility determination or technical evaluation that Remington was not "prejudiced"

---

[1] Under FAR § 9.104-1, to be determined responsible a prospective contractor must:

> (a) have adequate financial resources to perform the contract, or the ability to obtain them;
> (b) be able to comply with the delivery or performance schedule;
> (c) have a satisfactory performance record;
> (d) have a satisfactory record of integrity;
> (e) have the necessary organization to perform the work;
> (f) have the necessary production, and technical equipment, and facilities; and
> (g) be otherwise qualified and eligible to receive an award under applicable laws.

With regard to resources necessary to perform the contract under FAR § 9.104-1(f), the CO must ensure that there is evidence that the contractor has a commitment for the necessary facilities.  See FAR § 9.104-3.  A final responsibility determination is required before the contract may be signed.  FAR § 9.105-1.  A pre-award survey by the DCMA is authorized where the CO needs additional information to make a responsibility determination.  FAR § 9.106.

[2]  Pursuant to the contract, the two awardees must compete with each other for each task order beyond the first minimum order.

by any error because the government never guaranteed it would award two contracts.
With respect to Remington's motion to supplement, the government has agreed to add to
the record the bankruptcy documents the CO expressly states she reviewed and
considered, but opposes the inclusion of the other documents from the bankruptcy that
Remington has identified.  The government has also asked that several other documents,
including a declaration from the CO, be added to the record.

For the reasons discussed below, Remington's motion to supplement the
administrative record is **GRANTED**.  Remington's motion judgment on the
administrative record is **GRANTED IN PART AND DENIED IN PART**.   The case is
**REMANDED** for re-evaluation consistent with this opinion. Further, the government is
enjoined from awarding additional task orders to Colt until a new responsibility
determination based on the most up-to-date financial information is complete and
submitted to the court.[3]

## I.     MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

In deciding a bid protest, the court's review is ordinarily limited to the
procurement record existing at the time of the decision.   Axiom v. United States, 564
F.3d 1374, 1379 (Fed. Cir. 2009) (citing Camp v. Pitts, 411 U.S. 138, 142 (1973)).  The
Federal Circuit has held that supplementation is proper where "the omission of extra-

---

[3] The CO issued her responsibility determination in September of 2015.  The court understands
that on January 12, 2016, the bankruptcy court approved Colt's reorganization plan thus allowing
Colt to exit Chapter 11 bankruptcy proceedings.  However, as discussed below, Colt's
reorganization plan details the significant risks the company still faces.  Because the CO has not
yet adequately evaluated Colt's present risk factors, the case is not moot.

record evidence precludes effective judicial review.'" Id. (citing Murakami v. United States, 46 Fed .Cl. 731, 735 (2000)).  In the context of a case involving a parallel bankruptcy proceeding, this court has held that it "does not need every document in the [bankruptcy docket], only those documents relevant to the decision that is properly before the court." Eskridge Research Corp. v. United States, No. 10-50C, 2010 WL 1837799, at *3 (Fed. Cl. May 3, 2010) (citing Pers. Watercraft Indus. Ass'n v. Dep't of Commerce, 48 F.3d 540, 546 n.4 (D.C. Cir. 1995)).

Remington argues that because the CO has admitted that she reviewed bankruptcy court documents while making her responsibility determination, the court needs to review the bankruptcy documents relevant to Colt's financial status and lease arrangement at the time of award before any additional task orders are issued.  The government seeks to add to the record the documents from the bankruptcy proceeding the CO, Jacayln Dyda references in her affidavit. The government also seeks to add to the record Ms. Dyda's affidavit. In a telephonic conference held on January 8, 2016, the court agreed that the record would need to be supplemented with documents from the bankruptcy proceeding but reserved ruling on which documents until briefing was complete.  See January 8, 2016 Order, ECF No. 37. The government now seeks to add the following documents to the administrative record:

(1)   Declaration of Nikhil Menon [Menon Decl.] in Support of Debtors' Motion, Pursuant To 11 U.S.C. §§ 105, 363, And 365, And Fed. R. Bankr. P. 2002, 6004, 6006, 9008 and 9014 . . . , In re Colt Holding Co., No. 15-11296-LSS (Bankr. D. Del. Aug. 17, 2015), Dkt. No. 348;

(2)   Declaration of Keith Maib [Maib Decl.] In Support of the Debtors' Motion for Entry of an Order Approving Key Employee Incentive Plan

(KEIP), In re Colt Holding Co., No. 15-11296-LSS (Bankr. D. Del. Aug. 20, 2015)  Dkt. No. 361;

(3)     Statement of Financial Affairs for Colt Security LLC, In re Colt Holding Co., No. 15-11296-LSS (Bankr. D. Del. Aug. 25, 2015), Dkt. No. 392;

(4)     Notice of (I) Proposed Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, (II) Auction and (III) Sale Hearing Thereof, In re Colt Holding Co., No. 15-11296-LSS (Bankr. D. Del. Sept. 9, 2015), Dkt. No. 453 (indicating an anticipated Sale Hearing on October 26, 2015);

(5)     The "Hot Off The Press" internal publication and

(6)     The Declaration of Jacalyn B. Dyda, contracting officer

Gov't MJAR 42-44.  As noted, Remington agrees to the government's proposed additions to the record and has identified approximately twenty-five additional documents from the bankruptcy docket that it wishes to also add to record.  See Appendix A to Pl. MJAR ("Pl.'s App'x").

The court has reviewed the documents presented by both sides and concludes that the documents the government has identified and the additional documents Remington has identified from the bankruptcy docket are needed for effective judicial review. Remington has identified bankruptcy documents that show that Colt did not have a plan of reorganization in place at the time the CO signed her responsibility determination. Remington also has identified documents to show that Colt's relationship with its creditors, including Colt's landlord at the facility where it intended to manufacture M4s under the contract, were not resolved at the time the CO signed her responsibility determination.  Regardless of whether the CO reviewed each document, they were

6

available to her at the time she made her responsibility determination and she claims to have reviewed the bankruptcy court record.  In such circumstances, the court finds that the documents identified by both parties are necessary for effective judicial review and are thus properly before the court and will be added to the record.  Consequently, the motions of both parties are **GRANTED**.

## II.     FACTUAL BACKGROUND

### A.     The Solicitation

On December 5, 2014, the Army issued Solicitation No. W15QKN-15-R-001 (the "Solicitation") seeking offerors for up to two contracts to provide M4 and M4A1 carbines to the United States military.  AR 593.  The Army expected the awardees to be able to produce and deliver between 2,000 and 6,000 M4/M4A1 carbines per month.  AR 645.  If two companies were awarded the contract, "subsequent delivery orders will be competed based on best value between the awardees." AR 35-36.  The solicitation also provided that the proposals most advantageous to the Army would be selected utilizing the "Best Value Trade-Off" procedures.  AR 593.  The Solicitation set forth four evaluation factors: Production Capability, Past Performance, Small Business Participation, and Price.  AR 700.  Under the terms of the Solicitation, the factors were listed "in descending order of importance," with Production Capability identified as the most important factor, followed by Past Performance, Price, and Small Business Participation as the least important factor.  Id.

The Production Capability factor is the only factor at issue in this protest.[4]  The

evaluation of Production Capability was further divided into three subfactors,

Manufacturing Plan, Key Tooling and Equipment, and Quality Control, with the

Manufacturing Plan identified as the most important subfactor.  Id.  The overall

Production Capability factor included an evaluation of an offeror's risk of non-

performance, and set a range of five possible ratings:  Outstanding, Good, Acceptable,

Marginal and Unacceptable.  AR 701.  "Outstanding" and "Good" proposals reflected

"very low" and "low" risk, respectively, while "Marginal" and "Unacceptable" proposals

reflected high risk.  With regard to the "Manufacturing Plan," offerors would be

evaluated on their proposed manufacturing facilities, including the "adequacy of the

proposed production facility layout to accommodate a minimum production rate of 2,000

and a maximum production rate of 6,000 [M4s] per month," as well as the "adequacy and

capacity of the available weapon and ammunition storage facilities," and the adequacy of

proposed schedules.  AR 702.  Evaluation under "Key Tooling and Equipment" would

focus on the "capability of the key tooling and equipment that w[ould] be used to produce

the M4[s]" as well as the "adequacy of the proposed critical subcontractor support" for

certain M4 components, such as barrels, bolts, and receivers.  Id.  Finally, under "Quality

Management" the Army would assess the adequacy of the various quality management

systems, including whether the systems were compliant with ISO9001 standards, and

---

[4] Remington initially challenged the government's evaluation of the past performance factor in
Colt's proposal as well, but agreed at oral argument that this objection was not well-founded.
Therefore, the court will not further consider Remington's objections to Colt's past performance
evaluation.

whether the offeror had processes for inspecting, identifying, and preventing non-conforming products.  AR 702-03.

The Army received six offers, including offers from Colt, Remington, and FN. See AR 739-1478 (Colt's proposal), 1479-1933 (FN's proposal), 1934-2344 (Remington's proposal). Colt was the original developer and owner and licensor of the intellectual property for the M4 that was included in the solicitation's Technical Data Package ("TDP").  AR 2, 13.[5]

On July 22, 2015, the Source Selection Authority ("SSA") approved a competitive range that included only FN, Colt, and Remington.  AR 3006-24.  After discussions with the CO about their proposals, each offeror was given the opportunity to submit a final revision to its proposal.  Colt and FN each responded that their proposals, which they had amended with responses to the agency's evaluation notices, were their final proposals. AR 3097, AR 3263.  Remington, in addition to incorporating its responses to the evaluation notices, submitted a revised proposal which included an increased price on August 18, 2015.  AR 3273, AR 3274-98.

The proposals were evaluated and incorporated into the Source Selection Evaluation Board ("SSEB") Final Report.  See AR 3300-86.  Colt received an "Outstanding" rating for the Production Capability factor, including "Outstanding" ratings for the Manufacturing Plan and Key Tooling and Equipment sub-factors, and a

---

[5]  Under the terms of the solicitation other potential bidders would be provided the TDP and would pay a royalty fee of five percent "if the item is manufactured by an entity other than Colt" or its licensees.  AR 20.

"Good" for the Quality Control sub-factor.  AR 3317.  Overall, Colt was listed as having

seven "Significant Strengths" and twelve "Strengths" in its Production Capability

proposal.  Id.  The evaluation for this factor noted Colt's "extensive 20-plus year

background producing the Army's M4 carbine" as well as the fact that a [xxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx].  AR 3318.  Colt's position as the "owner

and licensee of all non-Government owned M4[] technology and[] technical data"

allowed Colt's proposal to "convey[] a deep knowledge of M4 production covering

virtually every aspect of the process."  Id.  The risk of unsuccessful performance was

rated as "very low."  AR 3317.[6]

Remington received a "Good" rating for the Production Capability factor, with

"Good" ratings for all three sub-factors.  AR 3336.  The report listed Remington as

having two "Significant Strengths" and fifteen "Strengths."  Despite "Remington's recent

2014 experience in producing up to 600 M4-type [R4A3] firearms daily for an

international military customer," Remington did not have a "hot" production line that

would enable the Government to waive the FAT requirement.  Id.  Remington's risk of

unsuccessful performance was rated as "low."  Id.

---

[6] FN received an "Outstanding" rating for the Production Capability factor and had seven
"Significant Strengths" and eleven "Strengths."  AR 3327.  The report noted that FN is
"currently producing US Army M4[] Carbines under Government contracts [xxxxxxx]."  Id.
FN's risk of unsuccessful performance was rated "very low."  Id.

For the Past Performance factor, both Colt and Remington received a rating of "Satisfactory Confidence," and FN received a higher "Substantial Confidence" rating. AR 3347, 3367.   The total evaluated price for Colt's proposal placed just slightly over $206 million.  AR 3372.  The total evaluated price for FN was at almost $219 million, AR 3374, and the total evaluated price for Remington was almost $230 million, AR 3376.

### B.   Colt's Bankruptcy and the CO's Responsibility Determination

On June 14, 2015, Colt filed for Chapter 11 bankruptcy protection.  Pl.'s App'x A1-50.  According to Keith Maib, Colt's Chief Restructuring Officer, Colt was suffering "from an over-leveraged capital structure that has resulted in ongoing liquidity constraints."  Id. at A209.  Mr. Maib stated that during "the second half of 2014 the Company continued to experience slow sales across all of its core business channels."  Id. at A210.  Colt also had a significant debt burden.  Colt was a borrower under a $72.9 million term loan, a $35 million revolving loan and $250 million in 8.75% Senior Notes maturing in 2017 (the "Senior Notes").  Id. at A209.  The Senior Notes required annual interest payments of $22 million, and were set to mature in 2017.  Id. at A212.  In Colt's Schedules of Assets and Liabilities, as amended, Colt identified owning only $5,027,406 in assets, while having aggregate liabilities of $384,839,567.  See id. at A54.  Colt acknowledged in many of its filings and sworn statements submitted to the Bankruptcy Court that it had been forced to borrow substantial amounts of money in the years preceding the submission of its proposal for this contract, was highly leveraged and facing severe liquidity issues.  See, e.g. id. at A209, A226-27.  As a result of the liquidity

problem combined with the high level of debt, Mr. Maib concluded that Colt "will not survive protracted chapter 11 litigation and delay," and determined that the "only other alternative" to an expedited reorganization "is chapter 7 liquidation," which would, among other things, "curtail the critical delivery of weapons to military and law enforcement agencies . . . ." Id. at A208.  In this connection, Colt also was exploring the viability of a bankruptcy 363 sale, in which a new owner would take over Colt's assets. This provision of the bankruptcy code envisions more money for creditors where a buyer is willing to pay a premium to take over the bankrupt company without any debt.  See 11 U.S.C. § 363.

    In addition to Colt's debt and liquidity problems, Colt's lease on the West Hartford facility, where Colt manufactured the bulk of its products and where it proposed to manufacture the M4s if awarded the instant contract, was in jeopardy.  The lease, which was between Colt and the building's owner, NPA Hartford, LLC ("NPA"), was set to expire on October 25, 2015.  Id. at A209-10.  NPA was partially owned by Colt's equity sponsor, Sciens Capitol Management, LLC ("Sciens"), and during the bankruptcy litigation, some of Colt's creditors accused Sciens of using its ownership of NPA to refuse extensions and modifications of the lease unless Sciens maintained its controlling interest in Colt.  Id. at A1567-A1568, A1652-A1653.  According to a motion filed by the creditors the loss of the lease would have meant Colt's destruction: "Sciens was threatening the [creditors] with the termination of the lease, and by extension, the destruction of [Colt], if [the creditors] did not accept their proposed exchange offer that left Sciens in control."  Id. at A294.  The Agency entered into discussions on July 28,

2015, approximately six weeks after the Petition Date.  AR 3436, 3044, 3142, 3203.  As

of the date of the Notice of Award in September of 2015, the dispute regarding the

Facility Lease was ongoing.  Pl.'s App'x A2307-A2327

    As part of its evaluation, the Army directed the DCMA to conduct a pre-award

survey.  See FAR § 9.106.  The DCMA conducted a financial evaluation of each of the

three offerors in the competitive range, including Colt.  The DCMA found Remington's

and FN's financial conditions to be satisfactory.  AR 3481, 3506.  However, the DCMA

issued a report on September 9, 2015, finding Colt's "overall financial condition to be

unsatisfactory."  AR 3422.  The DCMA found that as of July 5, 2015, Colt's current

liabilities exceeded its current assets by $332.9 million.   AR 3423.  According to the

DCMA, this "working capital deficit" left Colt without assets sufficient to meet its then-

current operational needs.  Id.  Further, the DCMA noted that Colt's net profit margin

was -53% as of July 5, 2015 (up from -59.5% for fiscal year 2014).  AR 3424.

Consequently, the DCMA concluded that Colt's "overall financial risk [was] HIGH."

AR 3422.

    After receiving the DCMA report, the CO sent Colt the following list of questions

addressing Colt's bankruptcy and the status of its lease negotiations:

> I.    How will the entity Colt Defense, LLC change after a
> 363 sale, should one occur? Specifically:
>
>    1.    Will it operate independently or even semi-
> independently from the other "Colt entities" or
> from a new parent company?
>
>    2.    What will be the extent of financial resources
> available [related to contract]?

a. What period of operation will these resources cover?

b. What are Colt's available lines of credit?

c. How would you characterize Colt's working capital?

3. Would the answers to the above questions be different if it were a restructuring vs. a 363 sale? If so, how and to what extent?

II. Will the command and control structure, corporate policies, procedures, and employees (corporate experience) differ after if Colt is restructured? If so, to what extent?

III. Lease Negotiations

1. What is the status of the ongoing lease negotiations between Colt and the landlord of its current facilities? In the event a new lease cannot be renegotiated, how and to what extent, would this affect Colt's ability to produce?

2. What are Colt's plans, if any, to relocate the manufacturing line in the event the current lease does not get renewed? How would this impact the ability to perform on a potential M4 contract award?

AR 3621. In her responsibility determination, the CO stated that on September 10, 2015, she discussed the DCMA report with Colt's management and asked them about the possibility of a "material change in the entity 'Colt Defense, LLC' due to the anticipated 363 sale (either in corporate structure, management, premises, facilities or personel)."

AR 3613. According to the CO, in that conversation:

Colt assured the Government that part of the "core sale value of Colt" was its relationship with the Government, including current contracts and any anticipated future awards. As stated in the [Reorganization Plan], Colt is very close to finalizing a restructuring agreement (the Term Sheet) with the Board and the Senior Noteholders, which would alleviate the need for a

> Section 363 sale and would leave Colt in a positive cash
> position with deleveraged debt. However, if that agreement is
> not finalized by the Bankruptcy Court by September 30,
> 2015, it would be necessary to proceed with the Section 363
> sale. But Colt emphasized that its intentions, whether through
> reorganization or the Section 363 sale process, did not include
> relocation of its manufacturing or other facilities or change in
> senior management or workforce personnel. Colt did say that
> if the Section 363 sale was consummated, any potential
> changes with regards to personnel or facilities would depend
> on the Buyer, and would require approval of the Bankruptcy
> Court.

Id.  Based on this conversation, the CO found that notwithstanding the negative

information in the DCMA report, Colt "does indeed possess the financial resources to

perform under the current contract, or will have the ability to obtain those resources." Id.

The CO explained that the "DCMA report was based on information submitted before

Colt had submitted its bankruptcy petition" and so the DMCA report was out of date.  AR

3614.  The CO also noted that "Colt's financial status is now being closely monitored by

the Bankruptcy Court." Id.

    With respect to Colt's manufacturing facilities, the CO found that:

> Colt currently has the production, construction, and technical
> equipment and facilities for the manufacture of the M4A1
> Carbines that are more than adequate to meet this
> requirement.  As of 09/22/2015 Colt is still in bankruptcy and
> the proceedings were still pending.  There was no decision
> made by the landlord, NPA Hartford, LLC as to renewal of
> the lease for the West Hartford facility; however, the current
> lease has been extended to November 26, 2015.  During the
> teleconference with Colt management on 10 September 2015,
> Colt reiterated that they had no intention of moving their
> plant or hiring new people and they were very confident in
> getting approval of their restructuring plan in a matter of
> days.

> Moreover, even if the restructuring plan is not approved and Colt must be sold, multiple other parties have already expressed an interest in purchasing Colt along with its technical equipment and facilities.  This is evidenced by the United States Bankruptcy Court documents which indicate the sale is due to take place in October, 2015 and instruments have been filed by Offerors regarding their intent to bid.
>
> In the event Colt were to relocate under a new entity the schedule might be affected.  The time it would take to obtain facilities, install equipment, hire or relocate personnel, obtain the necessary Preaward surveys and approvals of a new site might adversely impact the schedule. Colt would be required to pass First Article in time to meet the delivery schedule which must begin within 365 days after award.  However, as of 09/18/2015 Colt is operating as debtor-in-possession in Hartford, CT and has a reorganization plan (the Term Sheet) that is due to be finalized 30 September 2015.  The plan does not include relocating Colt to any site other than the current facility.  Further, during my teleconference with Colt leadership on 10 September 2015, they expressed to me that it was very unlikely that a relocation would occur.
>
> In light of the above, I have deemed Colt to have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them.

AR 3619.

On September 23, 2015, the CO signed the Determination, finding that Colt was a "Responsible Contractor."  AR 3620; see Dyda Decl. ¶ 8.  On the basis of the SSEB final report, the Source Selection Advisory Council ("SSAC" or "advisory council"), on September 24, 2015, evaluated the proposals and recommended that the contracts be awarded to Colt and FN, determining that they represented the best value to the Government.  AR 3400. The next day, the SSAC issued the Source Selection Decision Document for the solicitation. AR 3401-12.  The SSAC determined that there was "no

justification for the Government to pay Remington's price premium of 11.5% over Colt's or 5.1% over FN's" proposals.  AR 3411.  On September 25, 2015, Colt and FN were selected to receive the contracts.  AR 3636, 3722.  Remington was informed that it was not selected for an award.  AR 3808-09.  To date, two task orders for the minimum required amounts of $10,000 each have been issued to FN and Colt.  See AR 3637-3720 (Colt), AR 3723-3806 (FN).

After filing and then withdrawing a protest with the Government Accountability Office, Remington filed this protest on November 24, 2015.  On January 12, 2016, the bankruptcy court approved Colt's reorganization plan.  The parties completed briefing on their cross-motions on February 19, 2016.  Oral argument was held on February 26, 2016.

## III.   APPLICABLE STANDARDS

### A.   Standard of Review for Bid Protests

This Court has jurisdiction to review post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b).  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330 (Fed. Cir. 2001).  The court reviews the agency's decision pursuant to the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4); see also Impresa, 238 F.3d at 1333 (noting that "the 1996 amendments to the Tucker Act require that [courts] apply the APA standard of review").  Under 5 U.S.C. § 706(2), a court "shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  The Federal Circuit has stated that in a bid protest, the court must determine whether "the government acted without rational basis or

contrary to law when evaluating the bids and awarding the contract." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). In this context, a "disappointed bidder faces a heavy burden of showing that the award decision had no rational basis." Centech Group v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa, 238 F.3d at 1332-33). Agency action is irrational if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)). With respect to responsibility determinations in particular, the Federal Circuit has explained that "contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." Impresa, 238 F.3d at 1334-35. The Federal Circuit has further stated that responsibility determinations are "complicated business judgments" and that the court will not second guess them where there is supporting evidence. Bender Shipbuilding & Repair Co. v. United States, 297 F.3d 1358, 1362 (Fed. Cir. 2002).

### B.    Prejudice and Standing

The court will first address the government's argument that Remington was not prejudiced because there was no guarantee that the contract would be awarded to two

bidders, and Remington is not challenging the award of the contract to FN.[7]  In order to prevail in a post-award bid protest, the protestor "must first show that it was prejudiced by a significant error in the procurement process."  Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009) (quoting JWK Int'l Corp. v. United States, 279 F.3d 985, 988 (Fed. Cir. 2002)).  A party is "prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract."  Id. (citing Bannum, 404 F.3d at 1358).  In evaluating prejudice to the unsuccessful offeror, the court must "make factual findings from the record evidence as if it were conducting a trial on the record."  Bannum, 404 F.3d at 1354; see id. at 1357 (explaining that the "trial court's factual determination on prejudice . . . is entitled to review for clear error").

According to the government, because FN's proposal was superior to Remington's in a number of respects, Remington could not show it would have been awarded a second contract in Colt's place even if Colt had been eliminated.  The government further argues that because the Solicitation was for an IDIQ contract that contemplated the two awardees competing for work orders beyond the minimum order, Remington cannot demonstrate prejudice even if it were awarded a contract because FN, which had submitted a lower price, would likely receive the subsequent orders.

_____

[7] Though the government presented the prejudice issue as a secondary argument, the court is obliged to address it first because an argument that a party was not prejudiced is an attack on that party's standing, thus implicating the court's jurisdiction.  See Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (finding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.")

The court disagrees with the government, and finds that Remington has demonstrated that it had a "substantial chance" of securing the contract absent the alleged error in the procurement process.  In this case, the competitive range was limited to three bidders—Remington, Colt, and FN—and two of the three bidders were awarded the contract.  The Federal Circuit has found that a protestor had standing where, as here, the protestor finished directly behind the awardee in the evaluation.  See Galen Med. Assocs. Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir. 2004).  This case is therefore distinguishable from Linc Government Services v. United States, 96 Fed. Cl. 672 (2010), upon which the government relies.  In Linc, the court found that a protestor would lack standing if there would still be six offerors more highly rated than the protestor but for the alleged error.  Id. at 722-23.  By contrast, in this case, only FN and Remington would have remained in the competitive range had Colt been eliminated.

Though the government is correct that the solicitation did not explicitly guarantee that two contracts would be awarded, the agency's intent to award two contracts is evident from the structure of the contract (for example, the solicitation contemplated that two awardees would compete with each other for subsequent orders), and the fact that two contracts were in fact awarded.  If the court accepted the government's argument, a protestor's burden would rise from showing a substantial chance success to showing a near certainty receiving the award, a standard the Federal Circuit has explicitly rejected. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (finding that a protestor need not show it would have been awarded the contract but for the alleged error because "[s]uch a rule would make it virtually impossible for a protester ever to prevail . . . .").

The court also disagrees with the government's assertion that Remington was not prejudiced even if it had a substantial chance of being awarded a contract because there was no guarantee that it would receive any delivery orders beyond the minimum $10,000 order.  As an initial matter, the government does not cite any case law supporting its implication that a $10,000 order would be insufficient to support standing.  Further, the Federal Circuit has stated that the prejudice inquiry is focused on whether the protestor had a "substantial chance of securing the <u>contract</u>," <u>Lebatt</u>, 577 F.3d at 1379 (emphasis added), not subsequent delivery orders.[8]  This court declines the government's invitation to add additional requirements to the threshold issue of standing beyond what the Federal Circuit has prescribed.[9]  The court therefore concludes that Remington has established standing.

IV.   **DISCUSSION**

A.   **The CO's Responsibility Determination is not Supported by the Record.**

It is well-settled that a contract may be awarded to only responsible offerors.  48 C.F.R. § 9.103(a); <u>see</u> <u>Bender Shipbuilding</u>, 297 F.3d at 1361.  Thus, before awarding any contract, the CO must "make[] an affirmative determination of responsibility." <u>Bender Shipbuilding</u>, 297 F.3d at 1361 (quoting 48 C.F.R. § 9.103(b)).  The fact that Colt

---

[8] Remington asserts that the government's argument would "preclude a post award protest any time the contract at issue is a multiple award IDIQ."  Remington Reply 25.

[9] Further, the government's assertion that FN would have filled all of the delivery orders had FN and Remington been awarded the contract appears to be in tension with the government's argument against Remington's request for an injunction. In objecting to any grant of injunctive relief, the government argues that it would be harmed if only FN were able to fill the agency's orders.

was in bankruptcy is not determinative in this case.  As Remington acknowledges, the Federal Circuit found in <u>Bender Shipbuilding</u> that the pendency of a bankruptcy proceeding does not preclude a responsibility finding.  Remington argues, however, that this case is distinguishable from others where the responsibility determination was upheld, primarily because at the time the responsibility determination was made it was not certain whether Colt would be reorganized, sold, or even liquidated.  Colt's lease arrangement, and thus production capability, was also uncertain.  Remington argues that the CO failed to adequately address how Colt could be responsible in such circumstance.  Remington concludes that the CO therefore had no rational basis for concluding that Colt could perform the contract.

The government and Colt argue that the CO carefully considered Colt's financial status and did not ignore negative information and that the CO rationally determined based on the information she received from Colt's management and from the bankruptcy filings that Colt was financially capable and would have access to the facilities it needed to perform the contract.

For the reasons that follow, the court finds that the CO's finding that Colt had the necessary production capability to perform the contract at the time she made her responsibility determination is not supported by the record.  First, the court finds that the CO's stated reasons for disregarding the DCMA report were insufficient in light of the bankruptcy court record before the CO.  The CO stated that the DCMA report was based on old information, and that she had discussed Colt's current situation with Colt's management.  <u>See</u> AR 3614. In explaining why she diverged from the DCMA report, the

22

CO noted that "Colt's financial status is now being closely monitored by the Bankruptcy Court." Id. But the fact that Colt's status was monitored does not mean that the bankruptcy court would or could ensure Colt's continued viability, which the record in the bankruptcy court demonstrates was highly in doubt at the time of the responsibility determination. Nor does the CO explain how any more recent data would have altered the DCMA's conclusion based upon supposedly out of date information.

During the CO's September 10, 2015 call with Colt's management, Colt represented to the CO that it was "very close" to reaching agreement on a restructuring plan that would allow it to exit bankruptcy. AR 3613. Colt cautioned that such a deal would have to be consummated by September 30, 2015. Id. The CO signed the responsibility determination on September 23, 2015, thirteen days after that telephone conversation. AR 3620. By this time, the deadline for finding a 363 buyer had expired, no buyer had come forward, and no restructuring deal was in place. See Pl.'s App'x A2219; A2517.[10] Indeed, at that time the parties to the bankruptcy case were embroiled in litigation. Id. at A2301-A2327. The CO states that she reviewed all of the filings in the Bankruptcy Case. Dyda Decl. ¶ 3.a. Thus, she knew, or should have known, that the bankruptcy outcome was uncertain. In light of these facts, the court finds that it was not

---

[10] As of the date of the Responsibility Determination, approximately six weeks after the filing of the declaration upon which the CO relied, Sciens, the one buyer, had withdrawn it bid. Id. at A2516. Colt had a deadline of September 21, 2015 to find a replacement for Sciens. Id. at A2219. That deadline had passed and no replacement had been identified. Ultimately, the sale process failed because Colt did not receive a qualified offer. See id. at A2517. While the sale process had not yet formally collapsed on September 23, 2015, the proceedings in the Bankruptcy Case as of that date made clear that it had stalled. Colt was then faced the protracted Chapter 11 proceedings that Mr. Maib had described as unsustainable.

reasonable for the CO to rely only on Colt's representations to support her conclusion that Colt was financially able to perform the contract.  The self-serving comments from Colt's own employees were not consistent with the facts identified in the bankruptcy court records.

In addition, and equally importantly, the CO's conclusions regarding Colt's ability to manufacture M4s at its West Hartford facility are also unsupported. The lease on the Hartford facility was unresolved and the subject of litigation at the time she issued her responsibility determination.  Though Colt informed the CO that it intended to stay in the facility, the bankruptcy record shows that that decision did not appear to be within Colt's control.  The CO's determination did not mention the fact that Colt's creditors had accused Colt's landlord of using control over the West Hartford Facility as a means of maximizing its claims in the bankruptcy case and that Colt's ability to stay at the facility was uncertain. See Pl.'s App'x A1652-53.

It is for these reasons that the government and Colt's reliance on Bender Shipbuilding to support their contention that Colt's bankruptcy did not bar a responsibility finding is misplaced. The facts of this case differ sharply from Bender Shipbuilding, in which the Federal Circuit found that the CO's responsibility determination was based on ample evidence in the record to show that the company was financially able to perform.  In Bender Shipbuilding, the CO relied upon a DCMA report finding that the awardee "has satisfactorily demonstrated the requisite financial capabilities necessary for performance." Bender Shipbuilding, 297 F.3d at 1361.  The CO also considered the fact that the awardee's parent company had guaranteed the

awardee's performance, and reports and surveys stating that the awardee would acquire the necessary capital from the parent company's sale of another subsidiary. Id. at 1362. In this case, Colt could not give the CO any comparable assurances. Instead, the CO relied on Colt's stated expectations of how and when the bankruptcy proceedings would be resolved without undertaking an investigation into the reasonableness of those expectations. Under these circumstances, the court finds that the CO's decision to take Colt's word that the lease situation would shortly be resolved and that Colt would emerge largely intact from bankruptcy, when those statements were largely contradicted by Colt's filings in the bankruptcy case, was arbitrary and capricious. See Alabama Aircraft, 586 F.3d at 1375 (agency action is arbitrary and capricious when the agency "offered an explanation for its decision that runs counter to the evidence before the agency . . . .").

Colt has argued that because it has now exited bankruptcy, and has entered into a long-term lease for the West Hartford facility, the case is moot. However, Remington's protest was not limited to the fact that Colt was in bankruptcy, but challenged the CO's evaluation of the precarious financial situation that led Colt to file for bankruptcy in the first place. Though Colt has emerged from bankruptcy, the Disclosure Statement attached to its Second Amended Joint Plan for Reorganization contains approximately thirty pages of acknowledged risks to Colt's creditors, including substantial indebtedness. Pl.'s App'x 2600-2631. The CO has not yet evaluated these risks, and as such the court has determined that the case is not moot. Nor does the fact that the army has placed an initial order with Colt render the case moot, because the agency anticipates issuing

additional task orders in the future.  See Furniture by Thurston v. United States, 103 Fed. Cl. 505, 515 (2012).

**B.**     **Colt's Technical Evaluation was Not Arbitrary, Capricious, or an Abuse of Discretion.**

Remington also argues that the agency's technical evaluation of Colt was arbitrary, capricious, and an abuse of discretion because the Army failed to take into account Colt's financial status and the precarious nature of the West Hartford facility lease. The government argues that the technical evaluation was properly performed by technical specialists and that they properly limited their evaluation to a review of Colt's manufacturing capabilities as proposed in Colt's bid.

The court agrees with the government and finds that Colt's financial status and lease issues are properly considered as part of the responsibility determination and should not be evaluated as part of a technical evaluation.  The agency's technical evaluation under the Production Capability factor and the Key Tooling and Equipment subfactor was properly focused on technical matters such as "the Offeror's proposed assembly line," "weapon and ammunition storage facilities," and "[l]ong lead items," and sub-factors such as "the capability of the key tooling and equipment."  AR 3308-09.  In contrast, financial considerations such as whether Colt would still have access to its proposed manufacturing location are properly evaluated as part of the CO's responsibility determination.  The solicitation plainly states that the Production Capability subfactors were to be based on the "proposed production facility" and did not include an evaluation of the availability of that facility.  AR 3307-09.  The Army was limited to these criteria

and could not judge Colt's technical proposal based on other criteria.  See FAR §

15.305(a) (proposals are to be evaluated "solely on the factors and subfactors specified in

the solicitation").  Consequently, Remington's motion for judgment on the administrative

record with regard to the government's technical evaluation must be rejected.

## V.    INJUNCTIVE RELIEF

Having concluded that the government's responsibility determination cannot be

sustained, the court now turns to whether injunctive relief is appropriate and, if so, the

scope of such relief.  This court "may award any relief that the court considers proper,

including declaratory and injunctive relief except that any monetary relief shall be limited

to bid preparation and proposal costs."  28 U.S.C. § 1491(b)(2).  In deciding whether to

grant permanent injunctive relief, a court considers whether:  "(1) the plaintiff has

succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court

withholds injunctive relief, (3) the balance of hardships to the respective parties favors

the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive

relief."  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).  In this case, the

plaintiffs have succeeded on the merits.  Therefore, the court must consider whether they

will suffer irreparable harm if the court withholds injunctive relief, whether the balance

of hardships to the respective parties favors the grant of injunctive relief, and whether the

public interest is served by a grant of injunctive relief.

After considering the equities of the parties, the court concludes that the equities

balance in favor of issuing an injunction.  Remington has established that it has been

irreparably harmed by the government's failure to prepare a supported responsibility determination.  "When assessing irreparable injury, '[t]he relevant inquiry . . . is whether plaintiff has an adequate remedy in the absence of an injunction.'"  PGBA, LLC v. United States, 57 Fed. Cl. 655, 664 (2003) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)).  The government does not suggest alternative remedies for the plaintiff and courts have found that the "loss of potential work and profits from a government contract constitutes irreparable harm."  Springfield Parcel C, LLC v. United States, 124 Fed. Cl. 163, 194 (2015) (citations omitted).  The record shows that, but for the responsibility determination, Remington would have a substantial chance at the award as the one of three offerors to make the competitive range.  This court has found irreparable injury in similar circumstances.  See KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 362-63 (2015); Caddell Constr. Co. v. United States, 111 Fed. Cl. 49, 115-16 (2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 495 (2013).

The record further shows that the government has indicated that it will not be harmed by a limited injunction to allow for a proper responsibility evaluation because FN is capable of fulfilling the government's needs.  Dyda Decl. ¶ 9 ("If Colt was found not responsible or otherwise eliminate from competing for the award, the whole contract production could be absorbed by FN . . . .").  Thus, the court finds that the government will not be prejudiced by a limited injunction.  The court further finds that the public interest supports injunctive relief as well.  Where, as here, the government has awarded a contract to a party in bankruptcy without fully analyzing its ability to perform, the public

interest is served in either ensuring that Colt can produce the M4s or that another company be awarded a second contract if necessary.

The court will therefore enjoin the government from awarding any new task orders to Colt for 30 days or until the agency has performed a new responsibility determination that addresses Colt's current financial status and submitted that new determination, and award decision, if appropriate, to the court.  This approach is similar to the recommendation of the Defense Contract Audit Agency ("DCAA") in Bender Shipbuilding, 297 F.3d at 1361.  In that case, the DCAA found that the awardee, despite filing for Chapter 11 bankruptcy, "had sufficient financial capability to perform the base year, but recommended that another survey be made at the end of the base year before awarding a contract for any of the option years."  Id.  The court finds that this option best balances the interests of the parties and the public and is most likely to result in a speedy resolution of this matter.

## VI.   CONCLUSION

For the reasons stated above, Remington's motion to supplement the administrative record is **GRANTED**.  Remington's motion judgment on the administrative record is **GRANTED IN PART AND DENIED IN PART**.   The case is **REMANDED** for re-evaluation consistent with this opinion.  Further, the government is enjoined from awarding additional task orders to Colt until a new responsibility determination based on the most up-to-date financial information is complete and submitted to the court.  The government shall submit a status report on **Monday, April 25, 2016** updating the court on its revised responsibility determination.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge